# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEVEN SIMPSON, | ) |
| Plaintiff, | ) |
| | ) Case No. 17-cv-04165 |
| v. | ) |
| | ) Judge Sharon Johnson Coleman |
| SAGGEZZA, INC., ARVIND KAPUR, | ) |
| Individually, and SOCKALINGAM | ) |
| SUPPIAH, individually, | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Plaintiff, Steven Simpson brings this suit against Defendants Saggezza, Inc., ("Saggezza"), Arvind Kapur, and Sockalingam Suppiah, (collectively, "Defendants"), for various violations of the Illinois Wage Payment and Collection Act, 820 Ill. Comp. Stat. 115/1 et seq. ("IWPCA"), when the Defendants failed to provide Simpson with his earned compensation per the agreement between the parties and then retaliated against him for requesting payment. The Defendants now move this Court to dismiss Plaintiff's First Amended Complaint for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6). For the reasons set forth below, this Court grants Defendants' Motion in part.

## Background

The following facts are taken as true for the purpose of resolving this motion. Simpson, a Florida resident, worked for Saggezza from November 2014 through December 2016. Saggezza is an Illinois corporation, based in Chicago, that provides "global solutions" to financial institutions. Kapur is a co-founder and Chief Executive Officer of Saggezza. Suppiah was also a co-founder and the Chief Operating Officer of Saggezza. Both men were Simpson's bosses. They held hiring and firing authority as well as the power to determine the amount and allocation of compensation.

1

Prior to working at Saggezza, Simpson held positions as Executive Vice President at First Federal Bank in Florida and Chief Strategy Officer of City National Bank-Miami, earning over $300,000 per year in each role. The Defendants were aware of Simpson's professional experience and previous salaries when the company recruited him. On October 28, 2014, Kapur informed Simpson that the company had strong revenues of $40 million during a phone interview. After the conversation, Simpson agreed to travel to Chicago for an in-person interview. Both Kapur and Suppiah confirmed the financial health of Saggezza during the second interview. Kapur and Suppiah also mentioned that Saggezza had a five-million-dollar line of credit with Standard Bank and Trust of Hickory Hills, IL that only had a small line drawn on it.

To assist with recruitment, Saggezza initially offered Simpson a base salary of $210,000 per year with a minimum annual bonus of $120,000. Kapur and Suppiah informed Simpson that Saggezza paid its leadership incentive bonuses as a matter of course, which typically brought their salaries up to between $330-350,000 per year. The offer also included 100,000 shares of stock in Saggezza's employee stock option program. Based on the representations made about the strength of the company, the job description, the potential assignments, and the compensation structure, Simpson agreed to accept employment. Saggezza hired Simpson as the Senior Vice President of Financial Institutions Solutions. In that role, he was expected to lead a new line of business that focused on providing advanced analytics solutions for banks and credit unions and was promised a competent staff to support these efforts.

After joining Saggezza, Simpson found discrepancies in information that Kapur and Suppiah provided. Saggezza released or lost a significant number of qualified employees, who were replaced with "cheaper," less experienced workers. With the employment shifts, Simpson was expected to assume several additional job duties outside of the scope of his originally agreed upon employment terms. Simpson learned that Saggezza's revenues were approximately $23.3 million, not $40 million.

2

Simpson also discovered that the line of credit was fully drawn. Additionally, after Simpson's start, Saggezza introduced a new incentive structure that applied to all company leaders. Since this was different from what Simpson was presented during the interview, he addressed Kapur about his concerns. Kapur assured Simpson that the original agreement discussed during his recruitment would be honored, and Simpson continued his employment based on this information.

One of Simpson's major complaints was that he only received a bonus of $37,000 instead of the $120,000 he expected based on the Defendant's assurances. When approached about the $83,000 difference, Kapur and Suppiah told Simpson that Saggezza was experiencing financial troubles, but they could pay him $75,000 in three equal installments instead. Each payment would be made upon completing one of Simpson's five performance goals. Kapur also stated that he would provide Simpson with an additional 150,000 shares of Saggezza common stock to bring his ownership of the company up to 1%. Simpson agreed to this payment plan and continued working for Saggezza. A few weeks later, Kapur told him that he would need to sign an onerous employment contract to receive the additional shares. Simpson refused to sign the contract.

Simpson informed Kapur that three of the proposed goals were outside of his control since they were tied to sales of products in a different department's purview and impossible to attain in the 2016 calendar year. Kapur promised Simpson that he would provide alternative goals, but he delayed in doing so. Kapur orally agreed that if the other department's products were not ready for implementation in March 2016 that he would adjust the goals by reducing sales targets and numbers. Despite several attempts to codify this agreement, Kapur refused to put it in writing. In the meantime, Simpson began working on the remaining two goals. Between March and April 2016, Simpson met one of the goals. Kapur then attempted to back out of the agreement, but Kapur needed additional time to pay the first installment payment. Simpson agreed that the Defendants could pay half of the installment amount in April and the other half in May 2016. The April

3

payment was timely made, but May's payment was not. After repeated requests for payment, Simpson finally received the second half of the first installment payment.

The three remaining goals could not be completed because the underlying products were not ready for implementation and the Defendants could not provide reliable information about their expected completion dates. The Defendants denies that they failed to provide viable product information or alternative goals. Otherwise, Simpson met or exceeded the other agreed-upon expectations required for the payment of his 2015 bonus. The Defendants only paid him the initial $37,000 and one installment payment of $25,000. Kapur was continually elusive about when and whether Simpson would be paid when responding to Simpson's compensation complaints. Saggezza expressed frustration with Plaintiff's complaints about his not receiving his full bonus. In November 2016, an attorney hired by Simpson sent Saggezza a letter about Simpson's unpaid earned bonuses. After the letter, Simpson was invited to resign. Instead, Simpson continued his employment, even securing another large potential deal, which satisfied any remaining performance requirements for the payment of his 2015 bonus.

On December 28, 2016, Kapur held a meeting with Simpson to inform him that he would be terminated effective immediately. Kapur specifically referenced that he and Suppiah were upset about Simpson involving counsel and complaining about wage violations. No other cause or reasoning was provided for Simpson's termination.

Simpson filed his First Amended Complaint regarding the aforementioned issues for several violations of the Illinois Wage Payment and Collections Act on January 29, 2018. Saggezza now moves to dismiss the pleading in its entirety for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).

**Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations to state a claim for relief that is plausible on its face and raising the right to relief above speculation. *Ashcroft v. Iqbal*, 556 U.S. 62, 678 (2009). When reviewing a motion to dismiss, the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Pisciota v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

**Discussion**

*Count I – Earned Bonus Owed*

The Saggezza Defendants contend that Simpson's claim to recover his bonus fails and must be dismissed because he does not allege facts indicating that he was entitled to an "earned bonus" or any additional compensation related to his contract. A motion to dismiss is reviewed in a light most favorable to the nonmoving party.

Simpson's complaint is brought under the IWPCA, which provides that "payments to separated employees . . . shall be defined as wages, salaries, earned commissions, [and] *earned bonuses* . . . owed the employee by the employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2 (emphasis added). Earned bonuses are defined as "compensation given in addition to the required compensation for services performed." Ill. Admin. Code tit. 56, § 300.500; 820 Ill. Comp. Stat. 115/12. IWPCA only covers bonuses that are unequivocally promised by the employer, while conditional or discretionary bonuses are not considered "earned." *Sutula-Johnson v. Office Depot, Inc.*, No. 17-1855, 2018 U.S. App. LEXIS 17179, at *14-15 (7th Cir. June 25, 2018). Employees have the right to receive only an earned bonus at the time of separation when the terms of the bonus are unequivocally promised by the employer, and the employee has satisfied the expectations set forth in the agreement between the parties. Ill. Admin. Code tit. 56, § 300.500(a);

5

*see McLaughlin v. Sternberg Lanterns, Inc.*, 395 Ill. App. 3d 536, 917 N.E.2d 1065, 1071, 335 Ill. Dec. 1 (Ill. App. Ct. 2009)(explaining that unequivocal right to "earned bonus" under Illinois Administrative Code means employee has no right to it until she has performed the contract requirements.). The agreement need not be in writing to constitute a basis for a IWCPA claim. *See Osorio v. Tile Shop, LLC*, No. 15 C 15, 2015 U.S. Dist. LEXIS 159748, at *6 (N.D. Ill. Nov. 27, 2015)(Kennelly, J.)(finding that "under the IWPCA '[a]n "agreement" is broader than a contract and requires only a manifestation of mutual assent on the part of two or more persons; parties may enter into an "agreement" without the formalities and accompanying legal protections of a contract.'")(citing *Zabinsky v. Gelber Group, Inc.,* 347 Ill. App. 3d 243, 807 N.E.2d 666, 283 Ill. Dec. 61 (2004)); *see e.g.*, Harris v. Cent. Garden & Pet Co., No. 09 C 2354, 2011 U.S. Dist. LEXIS 84098, at *27 (N.D. Ill. Aug. 1, 2011)(Chang, J.)(recognizing an IWPCA claim based on an oral agreement).

Here, the initial bonus payment of $120,000 discussed during Simpson's recruitment does not appear, based on the facts alleged, to be tied to the accomplishment of any objective measures and cannot be considered "earned" per the definition. The subsequent installation payment structure agreed upon by both parties, however, was directly and unequivocally tied to the accomplishment of five definitive goals. Per the oral agreement, Saggezza agreed to give Simpson an installment payment of $25,000 for accomplishing each of the outlined goals up to $75,000. Although $75,000 is less than Simpson's initial demand that Saggezza pay the remaining $83,000 of the promised $120,000, Simpson did agree to the new bonus compensation plan. The facts alleged in the complaint show the requisite meeting of minds regarding the objective terms for the bonus. Further, the complaint alleges that Simpson satisfied the agreed-upon goals to create an entitlement to the agreed upon $75,000. Count I sufficiently plead that there was an unfulfilled earned bonus associated with the installment payment plan agreed upon by all parties. Accordingly, Defendants' motion to dismiss Count I is denied.

6

*Count II and IV - Retaliation*

The Defendants move to dismiss Simpson's retaliation claim, Count II, because they contend that Simpson fails to allege that the retaliation was motivated by his request for compensation or the hiring of an attorney. They also contend that Simpson failed to demonstrate that his discharge was in contravention of a clearly mandated public policy under Illinois law and so, Count IV should be dismissed.

The IWCPA permits employees to recover if an employer discharges that employee because he "has made a complaint to his employer . . . that he or she has not been paid in accordance with the provisions of this Act." 820 ILCS 115/14(c).

Here, Simpson alleged in paragraph 69 of his First Amended Complaint that "[h]ad [Simpson] not complained about [Saggezza's] failure to fully compensate him per their agreement, and had [Simpson] not brought a lawyer in to assert his rights, [Saggezza] would not have terminated [Simpson]." The facts set forth above clearly state that there existed an agreement for an earned bonus for performance. Further, the facts alleged indicate that Simpson believed the driving force behind his termination was the repeated requests, alone and through counsel, for the compensation he was owed under the agreed payment plan. Accordingly, the Court finds that Simpson sufficiently plead a claim for retaliation under IWCPA and Defendants' motion to dismiss Count II is denied.

Turning to Count IV, a successful claim for retaliatory termination under Illinois common law requires that the plaintiff show that he has been (1) terminated; (2) in retaliation for his action; and (3) that the discharge violates a clearly mandated public policy. *Geary v. Telular Corp.*, 341 Ill. App. 3d 694, 700-01, 275 Ill. Dec. 648, 653-54, 793 N.E.2d 128, 133-34 (2003)(citing *Paris v. Cherry Payment Sys.*, 265 Ill. App. 3d 383, 384, 202 Ill. Dec. 705, 707, 638 N.E.2d 351, 353 (1994)). "In order to constitute a clearly mandated public policy exception justifying application of the tort of retaliatory discharge, the matter 'must strike at the heart of a citizen's social rights, duties, and

responsibilities.'" *Id.* (quoting *Palmateer v. Int'l Harvester Co.*, 85 Ill. 2d 124, 130, 52 Ill. Dec. 13, 15, 421 N.E.2d 876, 878 (1981)). It is not enough to simply state a constitutional or statutory provision in a complaint to trigger a retaliatory discharge claim. *See McGrath v. CCC Info. Servs.*, 314 Ill. App. 3d 431, 440, 246 Ill. Dec. 856, 863, 731 N.E.2d 384, 391 (2000).

Here, the allegations state that Simpson was terminated in response to his demand for payment of his earned bonus, satisfying the first two prongs. As for the third prong, that the discharge violates clearly mandated policy, Simpson relies on *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* to contend that the narrow application of the common law retaliation tort has been expanded to include IWPCA claims since the Act was amended. No. 00 C 5755, 2001 U.S. Dist. LEXIS 18370 (N.D. Ill. Nov. 7, 2001)(Lefkow, J.). The Court disagrees with Simpson's interpretation of *Ladegaard.* While the *Ladegaard* Court recognizes that IWCPA involves the rights of the public, the holding determined that the rights protected by the act cannot be abrogated by private agreement, as doing so would contravene the act's underlying public policy agenda. The Court did not, however, address whether the rights in IWCPA were the type contemplated under Illinois common law. The precedent is clear that compensation disputes raised under IWPCA are of a private, economic nature and do not implicate the social rights, duties, and responsibilities required for a retaliatory discharge tort. *McGrath,* 314 Ill. App. 3d at 440. Accordingly, Simpson cannot establish that his termination violated a mandated public policy of Illinois so, the common law retaliation claim must be dismissed with prejudice. *See O'Donnell v. Am. at Home Healthcare & Nursing Servs.,* No. 12 CV 6762, 2015 U.S. Dist. LEXIS 18585, at *48 (N.D. Ill. Feb. 17, 2015)(Shah, J.)("But the Illinois courts have made clear that an employer who discharges an employee for asserting his rights under the IWPCA has not contravened a 'clearly mandated' public policy such that an action for retaliatory discharge is permitted."). Defendants' motion as to Count IV is granted.

*Count III – Fraudulent Inducement*

Finally, the Defendants argue that Count III should be dismissed because Simpson did not plead that his reliance on the Kapur and Suppiah's representations was justified.

A successful fraudulent inducement claim under Illinois law requires a plaintiff to allege: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance. *Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011). A person may justifiably rely on a representation of fact even if he could have ascertained that it was untrue upon making an investigation. *Field v. Mans*, 516 U.S. 59, 70, 116 S. Ct. 437, 444 (1995)(citing Restat 2d of Torts, § 540 (2nd 1979)). This is particularly true in situations where parties do not have equal knowledge or means of obtaining knowledge of the facts in question. *Sec. Ctr. v. Am. Tel. & Tel. Co.*, 94 C 6707, 1995 U.S. Dist. LEXIS 6540, at *19 (N.D. Ill. May 15, 1995)(Coar, J.)(*Ryan v. Wersi Elec. GmbH & Co.*, 3 F.3d 174, 182 (7th Cir. 1993)).

Here, Simpson alleges that Kapur and Suppiah made several statements about the financial health of the company and the opportunities available to Simpson during the initial interview and negotiations stages. The facts presented in Count III are sufficient to proceed on a claim of fraudulent inducement. Kapur and Suppiah were in positions of authority that afforded them easy access to the information they presented. Additionally, in an interview context, it is reasonable that a candidate would presume company's assurances about its status are true. It is critical here that co-founders Kapur and Suppiah were the Chief Executive Officer and Chief Operating Officer of Saggezza, respectively, because they would have intimate knowledge about Saggezza. Given the circumstances and their roles, Simpson had no reason to question Kapur and Suppiah's

9

representations at the time. Accordingly, it is reasonable to ascertain that Simpson could justifiably rely on Kapur and Suppiah's assurances to his detriment.

The Defendants' second point is that Simpson did not allege any false statements of material fact because the assurances were mere puffery that commonly occurs between a prospective employer and employee. For a statement to be actionable as fraudulent, it has to rely on a past or present fact. *Enter. Warehousing Sols., Inc. v. Capital One Servs.*, No. 01C 7725, 2002 U.S. Dist. LEXIS 4335, at *17 (N.D. Ill. Mar. 14, 2002)(Darrah, J.). Expressions of opinions, expectations, or future contingent events do not qualify. *Id.*

These allegations are not puffery. They do not contain superlatives or grandiose language about the strength of the company. *Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 866 (7th Cir. 1999). Kapur and Suppiah provided Simpson with precise, internal figures, capturing the financial state of the company and informed Simpson's potential compensation package. The information came from knowledgeable sources and were based on historical data, not prospective predictions. *Enter. Warehousing Sols.,* 2002 U.S. Dist. LEXIS 4335, at *17 (finding that statements about previous performance and approval does not constitute "puffery"); *cf. Jada Toys, Inc. v. Chi. Imp., Inc.*, No. 07 C 699, 2008 U.S. Dist. LEXIS 29286, at *6 n.4 (N.D. Ill. Apr. 10, 2008)(Brown, J.)("The court held that the allegedly false promise -- that the defendant would obtain millions of dollars of endorsements for a star baseball player -- was puffery because it involved something over which the defendant had no control."). There was no reason why Simpson would not have seriously relied on this insider information coming from credible sources.

As the Defendants have not challenged any other elements, the Court finds that all the elements have been properly alleged to support that Simpson relied on certain representations when he took the job, causing him financial and professional damage. Consequently, Defendants' motion to dismiss is denied as to Count III.

*Count V – Retaliatory Counterclaims*

The Defendants argue that Simpson's allegation of a "retaliatory counterclaim" claim is not legally cognizable under Illinois or federal law and must be dismissed.

Anti-retaliation rights are intended to prevent employers from "intimidating employees and discouraging them from enforcing their rights." *Beltran v. Brentwood N. Healthcare Ctr., LLC,* 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006)(Grady, J.). Courts rarely find that conduct arising during the scope of existing litigation amounts to retaliation, especially the filing of a compulsory counterclaim, because at the point that the counterclaim would have been filed, the plaintiff has already asserted his rights; they will not incur significant additional expenses because they have presumably already hired counsel; and defendants must bring compulsory counterclaims or risk waiver. *Ergo v. Int'l Merch. Servs.*, 519 F. Supp. 2d 765, 783 (N.D. Ill. 2007)(Leinenweber, J.)(citing *Steffes v. Stepan Co.*, 144 F.3d 1070, 1075 (7th Cir. 1998)). Counterclaims are only considered retaliatory when they are baseless. *Id.*

Here, Defendant's counterclaim was brought in response to Simpson's complaint. However, the mere fact that Defendants filed a counterclaim in this case is not sufficient to make out a claim for retaliation. *Beltran*, 426 F. Supp. 2d at 834 (finding that since filing a counterclaim is different from initiating a lawsuit, filing a counterclaim, without more, is not an adverse action that can support a retaliation claim."). As the Court finds that the counterclaims are not frivolous and were done in the normal course of litigation, they cannot be deemed retaliatory under the law. Accordingly, Count V is dismissed without prejudice.

**Conclusion**

For the above reasons, Defendants' Motion to Dismiss Plaintiff's Complaint is granted in part as to Counts IV and V and denied as to the remaining three counts.

IT IS SO ORDERED.

ENTERED: SHARON JOHNSON COLEMAN
United States District Court Judge

Dated: 8/8/2018